Filed 9/4/14  P. v. Hickman CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MAURICE R. HICKMAN,<br><br>    Defendant and Appellant. | A136149<br><br>(San Francisco County<br>Super. Ct. No. 213226) |

## I.  INTRODUCTION

Maurice Hickman was convicted of burglary, rape and several other offenses arising out of a home invasion assault.  On appeal, Hickman contends the trial court committed evidentiary and constitutional errors by admitting the preliminary hearing testimony of Lynn E., the assault victim who refused to testify at Hickman's trial.  Hickman also challenges the sufficiency of the evidence to support several of the convictions and alleges there was a prejudicial jury instruction error with respect to the burglary conviction.  We reject all of these contentions and affirm the judgment.

## II.  STATEMENT OF FACTS

### A.    *The Events of March 24, 2010*

#### 1.    *The Crime Report*

In March 2010, Lynn E. was 57 years old, although she looked much older than her age.  Lynn suffers from a severe abnormality of the spine; when she walks her spine is so curved that she is essentially looking down at the floor.  She does not walk quickly

1

or easily and she looks debilitated. Despite this condition and other health problems, Lynn was living alone in a second floor apartment on Dore Street in San Francisco.

On March 24, 2010, at 1:07 p.m., Lynn called 911 and reported that she had just been sexually assaulted in her apartment by an unknown assailant. Lynn's report was interrupted by her ringing door bell and then the call was terminated. At 1:13 p.m., Lynn placed a second 911 call. She reiterated that she had just been assaulted and reported that someone claiming to be her neighbor kept ringing her door bell and was trying to open her door. Lynn told the operator she would not open the door and begged for someone to help her.

San Francisco Police Officer Frank Tjia arrived at Lynn's apartment at approximately 1:15 p.m. When he first saw Lynn, Tjia thought she was between 70 and 80 years old, but he later realized that she looked 20 years older than she actually was; she was very frail, small framed and stooped over. Lynn was also angry and upset. Her gown was blood-stained, tears ran down her face, and she was visibly shaking as she made her way across the blood stained floor where she sat on a couch or chair.

At first, Lynn refused to answer questions and just wanted to smoke a cigarette. After about 10 minutes, she told Tjia what happened. She had been expecting Meals on Wheels when her doorbell rang. She answered the door and found a man wearing a dark hooded sweatshirt, dark sweatpants, gloves and a handkerchief on his face. He pushed her back into the apartment, Lynn scuffled with him and told him to leave. She screamed for help, but the man put a knife to her throat and said he would kill her if she would not be quiet. He pushed her on the floor and cut her underwear with the knife. The man inserted his penis into her vagina and also put it in her mouth. She repeatedly told him to stop and leave her alone. Finally, the man said " 'I gotta get out of here,' " and got up and left. Lynn reported that she immediately ran to the door and locked it.

Lynn told Tjia that she did not know the man who attacked her. But she also reported that she had bad eyesight and that the intruder's face was covered with a handkerchief. She did not know if he had worn a condom or if he ejaculated.

2

## 2.    *The Investigation*

Police Sergeant Peter Thoshinksy arrived at Lynn's building at 1:23 p.m.  He went to Lynn's apartment first.  She was a "wreck," sitting on the floor, crying, shaking and really upset.  While the paramedics treated her, Thoshinksy and another officer met with the building manager, Justin La, who gave them access to film from 39 surveillance cameras that were located throughout the public areas of Lynn's building.  The software that displayed the video footage captured by the cameras provided accurate date and time stamp references.

The video footage revealed two important facts.  First, nobody had left the building since the assault was reported which meant that "the suspect was still on the scene."  Second, the police located videotape which showed a suspect enter and leave Lynn's second floor apartment at the time the crimes were committed.  Videotape from the stairwell between the first and second floors of the building also showed that man entering the stairwell from the second floor, changing clothes and then going back out into the hallway onto the second floor.  The building manager identified the man as Hickman, a tenant in apartment 208 which was on the same side of the building and separated by one unit from apartment 204 where Lynn lived.

Video from a hallway camera showed Hickman leave his apartment and walk down the hall toward the stairwell.  Minutes later, a person who appeared to be Hickman but wearing different clothing came back into view, walked up the hall, paused and then entered Lynn's apartment.  Later, that same man came out of Lynn's apartment, walked down the hallway toward the stairwell, went out of the camera's view but then reappeared a few minutes later dressed differently, and went into Hickman's apartment.  The video footage from the stairwell camera seemed to confirm that a person changed clothes from the color Hickman was wearing when he first left his apartment to the colors worn by the man who came out of the stairwell and went to Lynn's apartment.  The segment of footage capturing Hickman as he returned to his apartment showed that he was carrying a cane.

At trial, Officer Thoshinsky testified that he "saw the video in its totality," and "only one person . . . went inside of 204 and 208." He was sure it was the same man because "by mannerism and walk and stature, the gentleman is pretty distinguishable in his walk." He has "extremely skinny calves, he's bull-legged, and he walks with an extremely wobbly gait."

After he watched the surveillance videos, Thoshinksy went and found Hickman in his apartment. At the time, Hickman had a visitor, a heavyset Black man, "well dressed" in a suit and blue or purple tie. That man did not appear on the surveillance footage. Hickman, on the other hand, matched the description of the suspect in the video; he was "the same race, same sex, same approximate height, and Mr. Hickman has very skinny bull-legged legs." Hickman also had the same "very white lips" as the man in the video and he was wearing black shorts that matched those worn by the suspect. Thoshinsky testified at trial that there "wasn't any doubt in my mind or any other officers present that . . . we were speaking to the same person we had seen in the video."

When Thoshinsky first made contact with Hickman, he seemed very anxious and nervous, avoided making eye contact and was defensive about why the police wanted to talk to him. Thoshinksy told Hickman about the recent assault, that Hickman appeared in the surveillance video and that it was important to find out why Hickman was in the stairwell in order to exclude him as a suspect. He asked Hickman to come outside to the ambulance where medics had taken Lynn.[1]

When they reached the ambulance, Thoshinsky gave Lynn a "cold show admonishment," and then opened the door and asked Lynn if Hickman was the man who assaulted her. According to Thoshinksy, "before anything could be said, Mr. Hickman looked directly at the victim and very sternly said, 'No ma'am.' " Then Lynn responded " 'no,' " in a "very quiet tone." So Thoshinksy released Hickman who went back to his apartment. But, after reviewing the video again, several officers returned to Hickman's

---

[1] Hickman was not wearing shoes and so the officers rummaged around for a pair he could wear. After denying that several pairs of shoes in his apartment belonged to him, Hickman finally put on a very large pair and went downstairs with the officers.

4

apartment. They told Hickman that he was clearly seen on the video and encouraged him to admit that he had gone to Lynn's apartment, but Hickman responded that Lynn had not identified him. Inspector Elaine Economus, who had taken charge of the investigation, placed Hickman under arrest.

When Hickman was arrested his clothing matched the clothes worn by the man shown on the videotape from the second floor hallway. He was wearing blue sweatpants over a pair of black shorts that had a distinctive design which matched the shorts worn by the man who went into Lynn's apartment. He was also wearing three pairs of white tube socks, pulled up high, and a white thermal shirt over a couple of dark colored tee shirts.

Officer Thoshinksy collected two items from Hickman's apartment that he had noticed on the videotapes, a black backpack and a pair of black tennis shoes. The first time Thoshinsky went to talk to Hickman he had noticed a walking cane on the couch. However, when he returned with other officers to make the arrest, the cane was gone. Thoshinsky testified at trial that, at some point while he was at the crime scene he saw the heavyset man who had previously been in Hickman's apartment walking down the street. The man was carrying the cane although he was not using it to walk.

### 3. *Hickman's Statements*

At the Hall of Justice, Hickman waived his *Miranda*[2] rights and agreed to talk with Inspector Economus. Initially, the inspector asked several background questions which Hickman did not take seriously, giving bizarre or obviously erroneous answers. For example, when asked where he lived before moving to Dore Street, Hickman said that he had lived "in hell," and then he said that he got what he needed by sleeping in "different women's beds."

When Economus focused on the events of the day, Hickman acknowledged that he knew who lived in the apartment two doors down but denied knowing her name. He described Lynn as an elderly woman between the ages of 75-80, who he would greet in the hallway. Hickman denied that he had ever been inside Lynn's apartment, but he told

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

5

Economus that he had knocked on her door earlier that day to find out if she was okay. Hickman reported that he was going down the stairwell in the building when he passed a Black man who was going up the stairs. The man was wearing a black hooded shirt and a bandana covering the lower half of his face. Hickman saw the man knock on Lynn's door. Later, he was standing outside his own apartment when the man left Lynn's apartment. Hickman knocked on her door to see if she was okay because he knew she lived there alone. She started screaming and refused to answer. Hickman could hear her on the phone saying someone had assaulted her. A few minutes later, the police arrived.

After Hickman completed his statement, the officer who escorted him from the interview room to the jail told him there was strong evidence that he had been inside Lynn's apartment and that he should just admit it. Hickman agreed to go back and talk to the inspector again. During the second part of his interview, Hickman admitted that he went into Lynn's apartment but he maintained that he did not sexually assault her. He explained that he rang Lynn's doorbell and said: "I'm your neighbor from down the hall and I just came to see if . . . I could borrow some money." Lynn opened the door and Hickman said "[M]a'am, I'm not here to hurt you, I'm not gonna put my hands on you, I'm gonna ask you a simple question. [¶] . . . [¶] I'm broke, I'm starving right now, can I borrow some money, I will pay you back." Lynn said she did not have any money but Hickman walked toward the television to see if there was any lying around. Then Lynn grabbed him but he shook her off. He pushed her hard and when she fell he tried to pick her up.

During the second part of his interview, Hickman admitted that he had changed his clothes in the stairwell. But he denied that had anything to do with Lynn. He explained that he had some business to take care of and that "there was somebody that I needed to put my hands on." He said that he had changed his clothes because he did not want to be recognized assaulting another person, but when Lynn did not have any money for him, he abandoned his plan, changed back to his regular clothes, and returned to his apartment.

6

**B.**   *The Forensic Evidence*

At the crime scene, police found a kitchen knife on the floor underneath a garbage can that had been toppled over. The blade and handle were swabbed for DNA and then dusted for fingerprints. There were no fingerprints on the knife which was consistent with Lynn's report that her assailant wore gloves. DNA testing did not detect identifiable biological fluids on the knife swabs, but there was some DNA that was susceptible to genetic analysis. That analysis identified Lynn as a possible contributor but excluded Hickman as the person whose DNA was found on the knife.

At San Francisco General Hospital, Lynn was treated by Kara Duffy, a physician assistant and forensic medical examiner. Initially, Lynn refused treatment and would not talk to Duffy. She was traumatized, "walking around and bleeding on the floor and yelling at people. It was very hard to contain her." Eventually, Duffy performed a "very limited speculum exam," which she had to terminate because Lynn could not endure the pain of it. However, she did see that Lynn's "vaginal vault" was full of blood and that she was actively bleeding. The amount and duration of the bleeding indicated that there was an internal laceration and significant trauma. But Duffy could not determine the source of the injury; it could have been caused by penile penetration, finger penetration or a foreign object. Lynn was hospitalized for two days. On the second day, she permitted Duffy to perform a very limited forensic exam, only allowing Duffy to take oral reference swabs and perianal swabs. Lynn's anal swabs tested presumptively positive for blood but not for sperm or saliva. Because the initial screen failed to detect any sperm, there was no further DNA analysis of the anal swabs.

On the day Lynn was assaulted, police took penile swabs and an oral reference swab from Hickman. Hickman's penile swabs tested presumptively positive for saliva and/or blood but not for sperm. A genetic analysis identified at least two contributors to the DNA detected on the swabs, Hickman and a second individual who was not Lynn.

**C.**   *Lynn E.'s Preliminary Hearing Testimony*

At the September 7, 2010, preliminary hearing in this case, Lynn testified about what happened to her on March 24 of that year. Lynn was home alone when her doorbell

7

rang at around 12:30 p.m.  She had not had any visitors that day but she was expecting a delivery from Meals on Wheels.  Lynn, who suffers from scoliosis and uses a walker, was wearing a robe, nightgown, underwear, socks and bandages on her legs.  She asked who was at her door but received a muffled response.  Assuming the person was from Meals on Wheels, Lynn opened the door to find an African American male wearing an oversized dark colored sweatshirt with the hood covering his head and a handkerchief over the lower part of his face.  He was also wearing plastic gloves.

The man pushed Lynn's walker back into the apartment and she had no choice but to move back with it.  Lynn tried to scream, but the man covered her mouth, started choking her, and told her to "shut up, bitch."  Lynn fell to the ground and the man banged her head against the floor as he continued to choke her.  He forcibly removed all of Lynn's clothing and he ripped off her underwear.  He struck her with his fists when she struggled to get away, repeating over and over that he would kill her and that he would fuck her like she had never been fucked before.

The man took a serrated knife from the kitchen counter, held it to Lynn's throat and told her he would kill her.  Then, he inserted part of his penis into her vagina.  Lynn also felt a separate strange, flat, hard object under the man's penis that the man inserted into her body causing her to bleed.  She could not tell if he was wearing a condom, but it felt like he was wearing something.  During the assault, which lasted between 15 and 25 minutes, the man attempted to insert himself or an object into Lynn's rectum and also forced his penis into her mouth.  He also inserted either himself or an object into her vagina a second time which caused additional bleeding and significant pain.

At the preliminary hearing, Lynn did not identify Hickman as her assailant.  When the prosecutor asked her if there was anyone in the courtroom that she recognized as the person who had assaulted her, Lynn responded, "I can't identify that person, no."

Under cross-examination, Lynn testified that she called the police to report the assault less than a minute after the intruder left her apartment.  Lynn recalled that, after she talked to the police and was moved outside to an ambulance, an officer asked her to

8

look at a suspect. Lynn testified that she was sure that the person she looked at when she was in the ambulance was not the person who assaulted her.

## D.     *The Jury Trial*

In March 2012, Hickman was tried on the following charges: count 1—residential burglary (Pen. Code, § 459[3]); count 2—rape (§ 261, subd. (a)(2)); count 3—forcible oral copulation (§ 288a, subd. (c)(2); count 4—assault with a deadly weapon (§ 245, subd. (a)(1)); count 5—false imprisonment (§ 236); count 6—making criminal threats (§ 422); counts 7 and 8—forcible sexual penetration by a foreign object (§ 289, subd. (a)(1)). The jury was also asked to resolve several special allegations, including personal use of a deadly weapon in connection with several of the charged offenses (§ 12022.3, subd (a), § 667.61, subd. (e)(4)), and commission of a burglary during the course of the sex offenses charged in counts 2 and 3 (§ 667.61, subds. (d)(4) and (e)(2)).

Over a defense objection, the trial court found that Lynn was an unavailable trial witness and admitted her preliminary hearing testimony into evidence at trial. During the trial, the jury also viewed several excerpts from the surveillance videotapes depicting the activity in the second floor hallway and stairwell immediately before and after Lynn was assaulted.[4] Both officer Thoshinsky and Justin La, the building manager at the Dore Street Apartments, testified about the content of the videotapes and answered questions from the jury about that evidence.

Kimberly Sylvester, a criminalist employed by the San Francisco Police Department, testified at trial about her DNA analyses of the forensic evidence. Sylvester expressly confirmed for the jury that there was no DNA evidence linking Hickman to the crime scene. As a follow-up question, the court asked whether any of Hickman's DNA was found anywhere on Lynn's body. Sylvester replied that the only swabs taken from Lynn were the anal swabs and she concluded that it would not be probative to conduct a

---

[3] Undesignated statutory references are to the Penal Code unless otherwise indicated.

[4] The jury also saw video which showed Hickman standing outside Lynn's apartment at the time she placed her 911 calls.

9

DNA analysis on them once initial screening failed to detect any sperm. At trial, Sylvester was also asked how the use of a condom would affect the collection of DNA on a penile swab and she gave this answer: "So if someone was wearing a condom, I would expect or I would assume that once the condom is removed, whatever DNA is on the condom will most likely not be on the actual penile swabs because the condom was acting as a barrier for that."

The trial court denied a defense motion to exclude statements Hickman made during his post-arrest interview and admitted an audio recording of that interview into evidence at trial. Both the prosecutor and defense counsel asked Inspector Economus several questions about the interview. For example, defense counsel asked Economus to confirm that Hickman had urged her to test the penile swabs that had been taken from him. Economus also acknowledged that, although she did not know it at the time of the interview, genetic testing excluded Lynn as a match for the DNA on the penile swabs. Under redirect examination, Economus testified that when a sexual assault suspect urges her to do DNA testing that is often a sign that he knows he did not leave any DNA because he used gloves and a condom.

The jury returned guilty verdicts on all of the charged offenses and special allegations with one exception. Hickman was acquitted on the count 3 charge of forcible oral copulation. Hickman was sentenced to a total indeterminate prison term of 29 years to life.

### III. DISCUSSION

**A.**    *Lynn's Preliminary Hearing Testimony*

**1.**    *Issue Presented*

Hickman contends that the admission of Lynn's preliminary hearing testimony deprived him of his constitutional rights to confrontation and due process.

"A criminal defendant has the right, guaranteed by the confrontation clauses of both the federal and state Constitutions, to confront the prosecution's witnesses. [Citations.] The right of confrontation 'seeks "to ensure that the defendant is able to conduct a 'personal examination and cross-examination of the witness, in which [the

10

defendant] has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.' " [Citations.] To deny or significantly diminish this right deprives a defendant of the essential means of testing the credibility of the prosecution's witnesses, thus calling "into question the ultimate ' "integrity of the fact-finding process." ' " [Citation.]' [Citation.]" (*People v. Herrera* (2010) 49 Cal.4th 613, 620-621 (*Herrera*).)

"Although important, the constitutional right of confrontation is not absolute. [Citations.]" (*Herrera, supra*, 49 Cal.4th at p. 621.) In California, the long-standing exception for testimonial statements by an unavailable witness has been codified in Evidence Code section 1291 (section 1291). (*Ibid; People v. Friend* (2009) 47 Cal.4th 1, 67 (*Friend*).) Section 1291, subdivision (a)(2) states: "(a) Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: . . . (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." " 'When the requirements of . . . section 1291 are met, "admitting former testimony in evidence does not violate a defendant's right of confrontation under the federal Constitution. [Citations.]" ' [Citations.]" (*Friend, supra,* 47 Cal.4th at p. 67.)

### 2. *Background*

The prosecution presented evidence that Lynn was unavailable at an Evidence Code section 402 hearing that was held on March 12, 2012. Maura Duffy, a senior investigator from the district attorney's office, testified that she personally served Lynn with trial subpoenas on February 16 and March 7, 2012. Duffy described Lynn as fragile with severe physical limitations. She testified that Lynn was 57, but had the appearance of a 90 year old woman. When Lynn was served with a subpoena, she looked "terrified" and said she did not want to come to court. When Duffy served the second subpoena, which instructed Lynn to appear on March 9, Lynn told Duffy she would not appear, that

11

she was petrified of coming and that she had not slept in her own bed since the preliminary hearing because she had been so frightened. Duffy went to court on March 9 but Lynn did not appear.

The prosecution also elicited testimony from Michelle Smith, a social worker who had been working as Lynn's case manager for approximately 10 weeks. Before that, Lynn had received services from the Trauma Recovery Center, a victim services agency that worked with Lynn for its maximum period of coverage. Smith testified that Lynn was currently housed at a building that provided services to ensure that she was receiving her proper medication. Smith conducted weekly home visits with Lynn to provide "support and therapy and work on her goals for psychiatric recovery."

Smith testified that when she met Lynn she would have guessed she was in her 80's. She described Lynn as extremely frail and weak, unsteady on her feet, and stooped over at about a 45-degree angle. Smith also testified that Lynn has to hold on to things so she does not fall over.[5] Her legs are often wrapped in bandages in order to prevent infection of persistent wounds caused by poor circulation in her lower extremities. And, she cannot read because one of her eyes does not focus directly forward. Lynn receives home support services but she does not have 24 hour care. She does not leave her apartment except for medical appointments which occur every two to three months. When she does go out, Lynn uses a wheelchair and a paratransit takes her to her appointments.

Smith testified that Lynn "had considerable fear and anxiety connected with the assault." Lynn reported that she had not been able to sleep in her bed because of anxiety and difficulty breathing, symptoms that came on after she testified at the preliminary hearing. She feared her symptoms would become worse if she had to testify again. When Smith talked with Lynn about the prospect of testifying at trial Lynn was "adamant" that she did not want to testify. She told Smith that although she wanted to

---

[5] In late February 2012, Lynn experienced a fall in her unit. She called 911 and an ambulance transported her to the hospital where she stayed overnight.

12

see the "defendant put away, in her words, she is adamant that she has already said what there was to say in the preliminary hearing and does not wish to come to court as she would find it upsetting and frightening."

Smith was with Lynn when Duffy served both trial subpoenas. When Duffy served the February 16 subpoena, she was accompanied by the prosecutor in this case and another employee from the district attorney's office. Although the visit was planned, Lynn appeared "frightened and alarmed when three people entered her unit at once to speak with her." She became very upset and wanted everybody to leave, but after Smith talked with her about the purpose of the visit, Lynn agreed to see each person individually. During that encounter Lynn expressed her fears about having to testify at trial. When Duffy served the March 7 subpoena, Lynn was agitated and nervous and she had difficulty putting together coherent thoughts and narrative which was not typically a problem for her. Nevertheless, Lynn reiterated that she did not want to come to court, that she continued to experience fear and anxiety about testifying and that she had already said everything that she had to say during the preliminary hearing. Smith testified that, after both subpoenas were served, Lynn was upset and nervous. Lynn told Smith the encounters raised a lot of thoughts and emotions and both times she needed Smith to stay with her after Duffy left until she could calm down.

At the conclusion of the March 12 hearing, the trial court directed the prosecutor to go through the process of serving another subpoena on Lynn in order to "nail down the record" but also made a preliminary finding that Lynn was unavailable. On the morning of March 19, the first day of trial testimony, the prosecution presented additional evidence regarding Lynn's unavailability. Maura Duffy testified that three days earlier, on the afternoon of March 16, she personally served Lynn with a subpoena to appear in court on March 19 at 9:00 a.m. When Duffy arrived at Lynn's unit to serve the subpoena, a caregiver answered the door and allowed Duffy to speak to Lynn for "a second." Duffy handed Lynn the subpoena and told her it was for the following Monday. This third subpoena, which was admitted into evidence, stated "Please advise if you need help with travel arrangements to court." Duffy testified that Lynn said thank you, but then

13

"dismissed me basically." Duffy also testified that she came to court that morning, waited approximately 30 minutes, and walked the hallways looking for Lynn, but Lynn did not appear at the courthouse.

The trial court made a formal finding that Lynn E. was "legally unavailable under California law." In reaching this conclusion, the court referenced Code of Civil Procedure section 1219, subdivision (b) (section 1219(b)), which states: "Notwithstanding any other law, no court may imprison or otherwise confine or place in custody the victim of a sexual assault or domestic violence crime for contempt when the contempt consists of refusing to testify concerning that sexual assault or domestic violence crime." The court reasoned that, although Lynn was not unavailable in the traditional sense, her "unwillingness and refusal to come to court amounts to unavailability" in light of section 1219(b). (Citing *People v. Cogswell* (2010) 48 Cal.4th 467 (*Cogswell*).)

### 3. *The Unavailability Finding*

Hickman contends the evidence summarized above does not support the trial court's finding that Lynn was unavailable because the prosecution failed to establish that it exercised good faith and due diligence to secure Lynn's attendance at trial. According to Hickman, "the prosecution served Lynn with subpoenas, but otherwise made *no effort* to facilitate her attendance."

"A witness who is absent from a trial is not 'unavailable' in the constitutional sense unless the prosecution has made a 'good faith effort' to obtain the witness's presence at the trial. [Citation.] The United States Supreme Court has described the good faith requirement this way: 'The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness'[s] intervening death), "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation. "The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness." [Citation.] The ultimate question is whether the witness is unavailable despite good-faith efforts

14

undertaken prior to trial to locate and present that witness.' [Citations.]" (*Herrera, supra,* 49 Cal.4th at p. 622.)

This good faith obligation is reflected in the language of Evidence Code section 240, subdivision (a)(5), which states that a witness is unavailable when he or she is " '[a]bsent from the hearing and the proponent of his or her statement has exercised *reasonable diligence* but has been unable to procure his or her attendance by the court's process.' (Italics added.) The term '[r]easonable diligence, often called "due diligence" in case law, " 'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.' " ' [Citations.]" (*Herrera, supra*, 49 Cal.4th at p. 622.) The due diligence requirement imposed by California law is essentially the same as the federal constitutional good faith requirement. (*Ibid.*)

"We review the trial court's resolution of disputed factual issues under the deferential substantial evidence standard [citation], and independently review whether the facts demonstrate prosecutorial good faith and due diligence [citation]." (*Herrera, supra,* 49 Cal.4th at p. 623.) Here, three sets of facts demonstrate to us that the prosecution satisfied its good faith obligation and exercised reasonable diligence to secure Lynn's attendance at trial.

First, the evidence shows that the prosecution did more than just serve subpoenas as Hickman contends in his appellate briefs. Maura Duffy personally served Lynn with three subpoenas. The first time Duffy went to visit Lynn, she was accompanied by two other individuals from the district attorney's office one of whom was the prosecutor who tried this case. Each of those individuals and Lynn's case worker spoke with Lynn about testifying at trial and yet she was adamant that she did not want to do it. When Duffy served the second subpoena, Lynn was so upset by the prospect of having to testify that she had trouble formulating a verbal response, but again reiterated that she was too afraid to return to court and, indeed, Lynn did not comply with that subpoena. Finally, when the third subpoena was served, Lynn simply "dismissed" Duffy and then, again, did not comply with the order to appear.

15

Second, the prosecution's efforts to secure the attendance of this witness were properly tempered by legitimate concerns about Lynn's serious physical problems and emotional vulnerability. Prior to the sexual assault, Lynn already had significant physical limitations. Not only did the crimes committed against her exacerbate those problems, they caused emotional damage. Furthermore, the experience of testifying at the preliminary hearing added another layer of damage, triggering symptoms which left Lynn unable to sleep in her own bed. Thus, the evidence in this record clearly shows that the very process of attempting to secure Lynn's presence at trial posed a significant threat of harm to her.

Third, as a victim of a sexual assault, Lynn was entitled to the protections afforded by section 1219(b) which, as noted above, precludes a court from using its contempt power to imprison, confine or place in custody a victim of a sexual assault for refusing to testify about that assault. This statute serves two important purposes. First it protects victims of sexual assault from the further victimization that would otherwise result from imprisonment or threats of imprisonment from our judicial system. Second, it begins to create a supportive environment in which sexual assault victims might be more willing to come forward to report and help prosecute perpetrators of sexual assault. (*Cogswell*, *supra,* 48 Cal.4th at p. 478.) *Cogswell* demonstrates that these statutory protections must be taken into account when assessing whether the prosecution used due diligence to attempt to secure the presence of a sexual assault victim at the defendant's trial.

The *Cogswell* defendant was charged with sexually assaulting Lorene B. while she was on vacation in California. (48 Cal.4th at p. 471.) Lorene, who had returned to her home in Colorado, traveled to California to testify at the preliminary hearing, but she refused to testify at trial. (*Id*. at p. 472.) The prosecution sought to compel Lorene's attendance by following the procedure set forth in the Uniform Act to Secure the Attendance of Witnesses from without the State in Criminal Cases (the Uniform Act). Pursuant to that procedure, the Colorado court issued a subpoena which was served on Lorene along with a round trip plane ticket and daily allowance for food and lodging. On the day Lorene was to appear at the California trial, she called the prosecutor and said she

16

would not testify. The trial was continued, another subpoena was issued and served along with a plane ticket and daily allowance. Under the Uniform Act, the prosecutor could have requested that Lorene be taken into custody and brought to court in California. However, the People elected not to make that request. (*Id*. at p. 472.) Lorene did not appear at the continued trial, she was declared unavailable and her preliminary hearing testimony was used to convict the defendant. (*Id*. at p. 473.)

The *Cogswell* court granted review to address the issue whether the prosecution had to "invoke the Uniform Act's custody-and-delivery provision before it could establish its use of due diligence in securing sexual assault victim Lorene's presence at defendant's trial[.]" (*Cogswell, supra*, 48 Cal.4th at p. 477.) Characterizing the custody-and-delivery provision as an " 'extreme' " measure, the court found that the prosecution's obligation did not require resort to that action for three reasons. (*Id*. at pp. 478-479.) First, Lorene twice told the prosecutor that she refused to testify, and then ignored a subpoena to appear at trial which made it "highly unlikely" that the act of taking her into custody would have transformed her into a cooperative witness. (*Ibid*.) Second, "if she had been transported against her will to California and then refused to testify, the trial court could not have held her in contempt and jailed her until she agreed to testify, because that remedy (ordinarily available when a witness refuses to testify) is not available when the witness who refuses to testify is a sexual assault victim. (§ 1219(b).)" (*Id*. at p. 479.) Finally, the prosecutor who spoke directly to Lorene was "in the best position to assess the strength of her determination not to testify at defendant's trial," and, based on that assessment, could reasonably have concluded that invoking the custody-and-delivery provision would have been a waste of time and resources because it would not have altered Lorene's decision not to testify again about the sexual assault. (*Ibid*.)

All three of the circumstances outlined in *Cogswell* are present here. First, the evidence establishes that Lynn was an uncooperative witness who was not likely to become cooperative if forced to appear at trial against her will. Second, even if that extreme measure had been taken, the trial court could not have used its contempt power to compel Lynn to testify. (§ 1219(b).) Third, the prosecutor, who had direct contact

17

with Lynn and her case manager and whose investigator met with Lynn on three separate occasions, was in the best position to assess the strength of Lynn's determination not to testify and, based on that assessment, could reasonably have concluded that any attempt to compel her attendance would not have altered Lynn's decision not testify at Hickman's trial.

In addition to the three factors that this case shares with *Cogswell*, there is the additional extensive evidence about Lynn's significant health issues. As discussed above, those issues were not limited to pre-existing conditions but were also exacerbated by the trauma of the sexual assault itself as well as the experience of testifying about that assault at the preliminary hearing. In light of this additional very significant factor, we have no trouble affirming the trial court's conclusion that the prosecution satisfied its good faith obligation to attempt to secure Lynn's presence at trial.

On appeal, Hickman intimates that the prosecution failed to exercise good faith because it did not request the issuance of a material witness warrant or body attachment after Lynn expressed her intention not to comply with the subpoenas. Hickman acknowledges that *Cogswell* "cautioned solicitude towards the sensitive nature of sexual assault trauma," but he insists that case does not preclude a court from compelling the trial attendance (as distinguished from the trial testimony) of a sexual assault victim. Rather, Hickman contends, the propriety of such an action depends on a "fact-intensive inquiry, specific to the unique circumstances of the case."

Hickman fails to identify any case that approves the use of any mechanism to physically compel the trial attendance of a sexual assault victim who has explicitly refused to testify. In any event, the fact-intensive inquiry Hickman requests alters nothing in his favor. The unique circumstances of this case would make it extremely improper to use any mechanism to compel Lynn to appear at trial against her will. Indeed, taking such an extreme action would have been not just inappropriate but dangerous in light of Lynn's condition.

Putting aside the question of compelling Lynn's attendance, Hickman complains that the prosecution did not actually make an effort to *facilitate* Lynn's attendance at trial.

18

In Hickman's view, Lynn's severe physical problems gave rise to a duty on the part of the prosecutor to provide her with appropriate transportation to the courthouse and therefore, as a matter of law, the prosecutor could not have exercised due diligence because nobody even talked to Lynn about how she might get to court. But the record shows that Lynn's refusal to testify had nothing to do with a lack of transportation. Lynn never raised that issue during the multiple conversations she had about whether she would testify at trial. Rather, the reason Lynn refused to testify was because she was terrified and traumatized not just by the assault itself but by the experience of having to testify about it at the preliminary hearing. Furthermore, the record also shows that on those rare occasions when Lynn left her apartment, transportation was available to her. In light of these facts, and the other circumstances discussed above, Hickman's complaint that the prosecutor never arranged transportation for Lynn is a red herring.

### 4. *The Similar Motive Requirement*

Hickman contends that even if Lynn was an unavailable trial witness, admitting her preliminary hearing testimony violated his constitutional rights. As noted at the outset of our discussion, in order for former testimony to be admissible under section 1291, subdivision (a)(2), the party against whom the testimony is offered must have had "the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has" at the current proceeding. Here, Hickman contends that his interest and motive to cross-examine Lynn at the preliminary hearing were materially different than they would have been had he been afforded that opportunity at trial.

The People contend this claim is waived because Hickman did not raise it in the trial court. Hickman counters that he made a hearsay objection to Lynn's preliminary hearing testimony which was sufficient to preserve all of the constitutional claims triggered by the admission of that testimony at his trial. As reflected in our analysis above, when former testimony satisfies the requirements of section 1291, its admission does not violate the defendant's constitutional right to confrontation. (*Friend, supra*, 47 Cal.4th at p. 67.) Arguably, therefore, Hickman's trial court objection that Lynn was not unavailable under section 1291 preserved his confrontation claim based on the same facts

19

and legal standards. (See *People v. Carasi* (2008) 44 Cal.4th 1263, 1289, fn. 15.) However, in the trial court, Hickman never argued that his examination of Lynn at the preliminary hearing was conducted with a different motive than he had for cross-examining her at trial. In any event, if this claim is not waived, it fails on its merits.[6]

"Frequently, a defendant's motive for cross-examining a witness during a preliminary hearing will differ from his or her motive for cross-examining that witness at trial. For the preliminary hearing testimony of an unavailable witness to be admissible at trial under Evidence Code section 1291, these motives need not be identical, only 'similar.' [Citation.] Admission of the former testimony of an unavailable witness is permitted under Evidence Code section 1291 and does not offend the confrontation clauses of the federal or state Constitutions—not because the opportunity to cross-examine the witness at the preliminary hearing is considered an exact substitute for the right of cross-examination at trial [citation], but because the interests of justice are deemed served by a balancing of the defendant's right to effective cross-examination against the public's interest in effective prosecution. [Citations.]" (*People v. Zapien* (1993) 4 Cal.4th 929, 975.)

Here, Hickman's interest and motive in cross-examining Lynn at the preliminary hearing were similar to those at trial: to challenge Lynn's memory and perception of the details of the assault, and to reinforce Lynn's prior statement to police during the show-up that Hickman was not her assailant. Accordingly, Hickman's opportunity to cross-examine Lynn at the preliminary hearing satisfied the confrontation clause.

Hickman contends that the defense had a materially different interest and motivation for cross-examining Lynn at trial than it had during the preliminary hearing. According to Hickman, the motivation and interest of the defense during the preliminary hearing was to undermine Lynn's credibility whereas at trial the defense motive would have been to bolster Lynn's credibility after she "adamantly denied appellant was her

---

[6] In light of this conclusion, we need not address Hickman's argument that the failure to preserve this issue constituted ineffective assistance of counsel.

20

assailant." However, this argument rests on the false premise that Lynn first denied that Hickman was her assailant after the preliminary hearing. In fact, on the very day of the attack, Lynn told police that Hickman was not her assailant. Thus, identity was always a material issue for the defense and, indeed, defense counsel elicited preliminary hearing testimony from Lynn on that very issue.

Hickman complains that when the preliminary hearing was conducted the "results of the forensic analysis were not yet available to the defense." Thus, his defense counsel "was unable to ask the kinds of detailed questions of Lynn that would have *bolstered* the defense" that he was not the perpetrator of the sexual assault. Specifically, Hickman contends that if he had known there was no DNA evidence linking him to the crimes, he would have attempted to elicit testimony from Lynn that the nature of the contact between her and her assailant would likely have left her DNA on him even if he used gloves and/or a condom.

First, Hickman fails to provide any record citation for his contention that he did not learn the results of forensic testing until after the preliminary hearing. Second, as discussed above, identity was always Hickman's primary defense and, regardless of the DNA tests results, his interest and motivation at the preliminary hearing was to elicit any details about the attack from Lynn that would bolster his claim that he was not the perpetrator of the attack. Third, settled authority establishes that "a defendant's interest and motive at a second proceeding is not dissimilar to his interest at a first proceeding within the meaning of Evidence Code section 1291, subdivision (a)(2), simply because events occurring after the first proceeding might have led counsel to alter the nature and scope of cross-examination of the witness in certain particulars. [Citation.] The 'motives need not be identical, only "similar." ' [Citation.] 'Both the United States Supreme Court and [the California Supreme Court] have concluded that "when a defendant has had an opportunity to cross-examine a witness at the time of his or her prior testimony, that testimony is deemed sufficiently reliable to satisfy the confrontation requirement [citation], regardless whether subsequent circumstances bring into question the accuracy

21

or the completeness of the earlier testimony." ' [Citations.]" (*People v. Harris* (2005) 37 Cal.4th 310, 333.)

**B.      *The Sex Offense Convictions***

Hickman contends there is insufficient evidence to support the sex offense convictions because the jury's finding that he was the perpetrator of those crimes is not supported by substantial evidence.

"When a defendant challenges the sufficiency of the evidence, ' "[t]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' [Citations.] 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. [Citation.]' [Citation.] We ' " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " [Citation.]' [Citation.]" (*People v. Clark* (2011) 52 Cal.4th 856, 942-943.) " 'The focus of the substantial evidence test is on the *whole* record of evidence presented to the trier of fact, rather than on " 'isolated bits of evidence.' " [Citation.]' [Citation.]" (*People v. Medina* (2009) 46 Cal.4th 913, 919.)

Under this test, the trial evidence supports the jury's finding that Hickman was the perpetrator of the sexual assault against Lynn. Specifically, the jury's conclusion was supported by the following facts that are established by substantial evidence: First, only one man went into Lynn's apartment on the day she was attacked. Second, Hickman was captured on video entering and leaving Lynn's apartment at the time she was attacked. Third, Hickman was captured on video changing clothing and attempting to hide his identity before and after he left Lynn's apartment. Fourth, Hickman intimidated Lynn so she would not identify him during the show-up conducted shortly after she was assaulted. Fifth, Hickman initially vigorously denied that he had ever been in Lynn's apartment but then subsequently admitted that he had gone inside on the very day and approximate time of the sexual assault.

22

Hickman acknowledges some of these circumstances and concedes they may be "suspicious," but he contends they are insufficient to support an inference that he was the perpetrator of the assault. According to Hickman, evidence that he entered Lynn's apartment may establish "opportunity" but any "leap" from this evidence of opportunity to a conclusion that Hickman "in fact committed" the crimes would be speculation and conjecture. This hyperbolic argument ignores the actual evidence which substantially supports a finding that Hickman was the only individual who could have committed the crimes and the substantial evidence that the crimes were committed.

Hickman also attempts to poke holes in the prosecution's case arguing, for example, that the evidence "did *not* exclude the possibility" that he entered Lynn's apartment after the attack, and that admissions he made during his recorded interview did not "unambiguously point to his guilt as the *attacker*." However, the " 'test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt.' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576.) This " ' " standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " [Citations.]' [Citation.] ' "Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt." ' " [Citation.]' [Citation.]" (*People v. Jones* (2013) 57 Cal.4th 899, 960-961.)

Hickman intimates that the jury's finding cannot be reconciled with the facts that Lynn did not identify him and that there was no forensic (DNA) evidence that he committed the sex offenses. However, these circumstances do not vitiate the evidence summarized above. Lynn's failure or refusal to identify Hickman was consistent with

23

evidence that he intimidated her during the show up. Furthermore, the absence of forensic evidence was consistent with Lynn's testimony that her attacker wore gloves and may have worn a condom. In this regard, we note that the jury acquitted Hickman of the forcible oral copulation charge. Thus, the jury did not ignore the forensic evidence but nevertheless found that other evidence was sufficiently compelling to establish beyond a reasonable doubt that Hickman sexually assaulted Lynn.

## C.    *The Burglary Conviction*

Hickman contends his burglary conviction must be reversed because (1) it is not supported by substantial evidence; and (2) the trial court gave an improper jury instruction regarding the intent element of burglary.

### 1.    *Background*

Burglary is the "entry into any building with the intent to commit a grand or petty larceny or any felony." (*People v. Smith* (2006) 142 Cal.App.4th 923, 929; see § 459.) To instruct the jury regarding the elements of this offense, the trial court used a version of CALCRIM No. 1700 which stated:

"The defendant is charged in Count 1 with burglary in violation of Penal Code section 459. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant entered an apartment within a building; [¶] AND [¶] 2. When he entered an apartment within a building, he intended to commit Theft or Rape by Force, Forcible Oral Copulation, Forcible Sexual Penetration, Assault With a Knife, False Imprisonment, or Criminal Threats.

"To decide whether the defendant intended to commit Theft or Rape by Force, Forcible Oral Copulation, Forcible Sexual Penetration, Assault With a Knife, False Imprisonment, or Criminal Threats, please refer to the separate instructions that I will give you on those crimes.

"A burglary was committed if the defendant entered with the intent to commit Theft or Rape by Force, Forcible Oral Copulation, Forcible Sexual Penetration, Assault with a Knife, False Imprisonment, or Criminal Threats. The defendant does not need to have actually committed theft or Rape by Force, Forcible Oral Copulation, Forcible

Sexual Penetration, Assault With a Knife, False Imprisonment, or Criminal Threats as long as he entered with the intent to do so.

"The People allege that the defendant intended to commit theft or Rape by Force, Forcible Oral Copulation, Forcible Sexual penetration, Assault With a Knife, False Imprisonment, or Criminal Threats. You may not find the defendant guilty of burglary unless you all agree that he intended to commit one of those crimes at the time of the entry. You do not all have to agree on which one of those crimes he intended."

In accordance with the instruction quoted above, the trial court gave the jury separate instructions regarding the target offenses pertaining to the intent element of the burglary. With respect to the target offense of theft the court instructed the jury regarding the elements of theft by larceny with a version of CALCRIM No. 1800, which stated:

"To prove this crime, the People must prove that: [¶] 1. The defendant took possession of property owned by someone else; [¶] 2. The defendant took the property without the owner's consent; [¶] 3. When the defendant took the property he intended to deprive the owner of it permanently or remove it from the owner's possession for so extended a period of time that the owner would be deprived of a major portion of the value or enjoyment of the property; [¶] AND [¶] 4. The defendant moved the property, even a small distance, and kept it for any period of time, however brief."

### 2. *Sufficiency of the Evidence*

Hickman contends the record does not contain substantial evidence that he entered Lynn's apartment with the intent to commit a theft. According to Hickman, the "only evidence" regarding his intent when he entered Lynn's apartment was the recorded statement he gave to police after he was arrested and, during that interview he told police that he entered Lynn's apartment with the intent to borrow money, not to steal it. This argument fails for two independent reasons.

First, as reflected in jury instructions quoted above, the jury did not have to find entry with intent to steal in order to convict Hickman of burglary. Instead, for example, it could have found that Hickman entered Lynn's apartment with the intent to commit one of the charged sex offenses. Although Hickman acknowledges that this alternative theory

25

was legally valid, he reiterates his claim that there is insufficient evidence that he was the perpetrator of the sexual assault. However, we have already rejected that claim.

Second, the record also contains substantial evidence that Hickman entered Lynn's apartment with the intent to commit a theft. During his recorded statement, Hickman told Inspector Economus that he went to Lynn's apartment because he needed money. Although he claimed that he only asked to borrow money, he also admitted that when Lynn said no, he walked into her apartment toward the television to see if she had any money lying around. And, when Lynn tried to stop him from looking around, he pushed her. If these admissions were not sufficient circumstantial evidence of entry with intent to commit a theft, subsequent revelations that Hickman made to Inspector Economus certainly were. At one point during that interview, Hickman stated: "I apologize for going in her house trying to take her money." And later he asked, "So, can I go for attempted robbery . . . ." Thus, substantial evidence does support a finding that Hickman entered Lynn's apartment with the intent to commit theft.

### 3. *The Trial Court's Remark*

Hickman contends that when the trial court delivered the jury instructions, it committed constitutional error by adding an instruction which essentially directed a verdict for the prosecution on the burglary charge.

The trial record reflects that when the trial court orally instructed the jury, it prefaced the giving of CALCRIM No. 1800 with this comment: "Because the defendant asserted that he entered—to the police, that he entered with the intent to commit theft or to get money, you're going to be instructed by the court on larceny. To prove this crime, larceny is another—theft is a form of larceny. Excuse me. Larceny is a form of theft." On appeal, Hickman interprets this prefatory remark as telling the jury that Hickman "admitted to the essential elements of burglary—that he entered Lynn's apartment with the intent to commit theft." As such, Hickman contends, the remark denied him constitutional due process because it lessened the prosecutor's burden of proof by directing a verdict on the intent element of the burglary charge.

26

"[J]ury instructions relieving the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violate the defendant's due process rights under the federal Constitution. [Citations.] Such erroneous instructions also implicate Sixth Amendment principles preserving the exclusive domain of the trier of fact. [Citations.] 'Thus, although a judge may direct a verdict for the defendant if the evidence is legally insufficient to establish guilt, he [or she] may not direct a verdict for the State, no matter how overwhelming the evidence. [Citations.]' [Citations.] The prohibition against directed verdicts for the prosecution extends to instructions that effectively prevent the jury from finding that the prosecution failed to prove a particular element of the crime beyond a reasonable doubt. [Citations.]" (*People v. Flood* (1998) 18 Cal.4th 470, 491-492.)

The People disagree with Hickman's characterization of the trial court's challenged remark. They contend that the court made a "passing comment" about admissions in Hickman's recorded statement in order to explain why the court was instructing the jury regarding the elements of theft by larceny. Thus, in the People's view, the trial court's comment was a proper exercise of its power to comment on the evidence.

"A California trial court may comment on the evidence, including the credibility of witnesses, so long as its remarks are accurate, temperate, and 'scrupulously fair.' [Citation.] Of course, the court may not express its views on the ultimate issue of guilt or innocence or otherwise 'usurp the jury's exclusive function as the arbiter of questions of fact and the credibility of witnesses'. [Citation.] The propriety and prejudicial effect of a particular comment are judged both by its content and by the circumstances in which it was made." (*People v. Melton* (1988) 44 Cal.3d 713, 735; see also Cal Const, art. VI § 10 ["The court may make any comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the cause."].)

We agree with the People for two primary reasons. First, the trial court did not expressly or implicitly instruct the jury to make any finding regarding Hickman's intent

27

but rather recounted the trial evidence that Hickman told Inspector Economus that he went into Lynn's apartment because he wanted money. Second, when read in context, the trial court's remark clearly was an explanation to the jury about the relevance of the theft by larceny jury instruction. As stated in the CALCRIM No. 1700 instruction quoted above, theft was one of the target offenses alleged in connection with the intent element of burglary. However, in contrast to the other target offenses, Hickman had not actually been charged with theft. Thus, the court referenced Hickman's post-arrest admissions to Inspector Economus in order to explain the basis for the prosecution's theory that Hickman committed burglary by entering Lynn's apartment with the intent to commit a theft.

Hickman appears to concede that the trial court intended its comment to be explanatory but insists that its effect was to instruct the jury that Hickman admitted all of the elements of burglary, i.e. that he entered Lynn's apartment with the intent to steal. We disagree. For the court's comment to have had such an effect, the jury would have to have literally ignored the numerous formal written jury instructions regarding the burglary charge. We simply do not believe the jury would have interpreted the trial court's passing remark in that unreasonable way.

Furthermore, even if the court's comment was error, it was harmless beyond a reasonable doubt. (See *Flood*, *supra,* 18 Cal.4th at p. 505 [instruction error removing an element of the crime from the jury's consideration is amenable to harmless error analysis.].) As discussed above, the prosecutor alleged multiple alternative theories for establishing the intent element of burglary. Thus, an instructional error with respect to the intent to commit theft theory would be harmless if the record establishes beyond a reasonable doubt that the jury based its verdict on a different legally valid theory for proving the felonious intent element of the burglary charge. (See *People v. Chun* (2009) 45 Cal.4th 1172, 1203.)

Here, after the jury found that Hickman was guilty of rape, it also found true a separate section 667.61 enhancement allegation that Hickman committed the charged rape during the commission of a burglary with the intent to commit rape. Since the jury

28

made an express finding that Hickman committed the burglary with the intent to commit rape, the record demonstrates beyond a reasonable doubt that any error in the instruction regarding the alternative theory that Hickman committed the burglary with intent to commit theft did not contribute to the verdict on the burglary charge.

## IV.  DISPOSITION

The judgment is affirmed.

_____
Brick, J.*


We concur:


_____
Kline, P.J.


_____
Richman, J.


* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

30